IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2004 Session

## STATE OF TENNESSEE v. BRIAN DOUGLAS WILLIAMS

**Direct Appeal from the Circuit Court for Madison County**
**Nos. 02-469; 02-470      Roger Page, Judge**

---

**No. W2003-00803-CCA-R3-CD  - Filed June 10, 2004**

---

The Appellant, Brian Douglas Williams, appeals the decision of the Madison County Circuit Court revoking his probation. In August 2002, Williams entered "best interest" pleas to stalking, harassment, and aggravated assault and received an effective eight-year sentence. These sentences were suspended, and he was placed on supervised probation. On October 18, 2002, a warrant was issued, alleging that Williams had violated a condition of his probation by contacting the victim. After a hearing, Williams was found to be in violation of his probation, and his original consecutive sentences to the Department of Correction and the County Workhouse were reinstated. On appeal, Williams argues that the evidence fails to establish that he violated his probation. After review, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

David W. Camp, Jackson, Tennessee, for the Appellant, Brian Douglas Williams.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Jennifer L. Bledsoe, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On August 12, 2002, the Appellant entered "best interest" pleas to stalking, harassment, and aggravated assault of the victim, the Appellant's estranged wife, Anna Williams. Pursuant to the negotiated plea agreement, he received consecutive sentences of six years in the Department of Correction for his aggravated assault conviction, eleven months and twenty-nine days in the County

Workhouse for his stalking conviction, and eleven months and twenty-nine days in the County Workhouse for his harassment conviction.[1] His sentences were suspended, and he was placed on probation. As conditions of probation, the Appellant was ordered to attend anger management classes, and he was "prohibited from having any contact with the victim other than what [was] necessary in court proceedings dealing with the parties' divorce." On October 18, 2002, a probation violation warrant was issued, alleging that the Appellant had violated his probation by having contact "with the victim other than what [was] necessary in court proceedings dealing with the parties' divorce."

A probation revocation hearing was held on November 12, 2002. On this date, the parties' divorce proceedings were still pending. The victim testified that, on October 12, 2002, she "rode through" the parking lot of the Jackson Bowling Alley and saw the Appellant talking to a police officer. After seeing the Appellant at the bowling alley, she became upset, and her friends drove her home. Immediately upon entering her house, the phone began ringing. The victim answered the phone, but no one said anything. She stated that this happened two or three times in five minutes. The Appellant's cell phone number appeared on the caller ID, which was verified at trial by the introduction of the Appellant's cell phone records. She and her friends then left the house and drove towards Brownsville, where she intended to stay for the evening. While traveling on I-40 in Jackson, she passed the Appellant's Jeep traveling in the opposite direction. The victim then dialed 911 and told the operator that she had seen the Appellant and he was probably headed to her house.

While driving towards Brownsville, the victim began receiving calls on her cell phone. During the first call, a female voice stated, "This is Carter Jones' wife and I'm sitting home pregnant and I'm going to kick your ass." The victim explained that Carter Jones was driving her car at the time and the voice on the phone was not his wife. The victim stated that she spoke with the female three times, who basically said the same thing each time. During this time, she also continued to receive calls during which no one would say anything. There were also two voice mails left on her cell phone. Concerning these two messages, the victim testified that:

> The first voice mail said, "Anna, this is Carter Jones' wife. And I saw you out with my husband, you goddamn bitch. I'm going to kick your ass. Do you hear me? I'm going to fuck you up. I'm going to fuck you up, you fat bitch." That's exactly what it said.
>
> . . . .
>
> The second one was her talking to someone else. And she said, "Tell her you're going to kick her ass. Tell her." And that's what - - that's all I heard. . . .

---

[1]The probation order of August 12, 2002, indicates that the Appellant was convicted of two counts of harassment. The probation violation warrant also shows convictions for two counts of harassment. Moreover, the November 12, 2002 probation revocation hearing and the revocation order entered on the same date refer to convictions for two counts of harassment. However, it is clear from the indictment and judgment forms that the Appellant was only indicted for and convicted of one count of harassment.

The victim testified that, when she arrived home the following morning, her mailbox was completely uprooted and it appeared to have been run over. Furthermore, the victim stated that the Appellant drove by her house "the day after that he got out of jail[,]" which was in violation of his probation.

Leigh Nolen was at the bowling alley with the Appellant and John Hopper on the evening of October 12th. Nolen and the Appellant had been friends for several years. Nolen testified that she, the Appellant, and Hopper were in the parking lot of the bowling alley having a conversation with Officer Mark Heddin. While talking, Nolen observed the victim drive by the group and then leave the bowling alley parking lot. According to Nolen, the Appellant did not appear to be upset when the victim drove by with another man. John Hopper also testified that the Appellant did not appear to be upset.

According to Nolen, she and the Appellant arrived at John Hopper's house shortly thereafter. Nolen admitted that she then used the Appellant's cell phone to call the victim. She testified, "[The Appellant] had gotten out of the truck - - gotten out of the Jeep and went around to the back of the house. I don't know what he was doing back there. I wasn't back there. I was in the truck making calls." Nolen stated that she was in possession of the Appellant's cell phone because a "friend was going to be calling[.]" She explained that she placed the phone calls because she "was angry at the world" and "wanted to take it out on somebody." Nolen also testified that she did so without the prior knowledge, instruction, or direction of the Appellant. According to Nolen, when she later told the Appellant about the phone calls, he became angry. Nolen stated that, on this evening, she had consumed one beer and taken hydrocodone.

Upon inquiry by the court, Nolen recited the victim's home and cell phone numbers. She claimed that she had seen the victim's cell phone number on a folder that the Appellant left in her car "two months before this incident[.]" She also stated that she knew the victim's home telephone number because she had looked it up in the phone book "some three or four months" earlier. Nolen understood that her sworn testimony resulted in an admission to a crime.

The Appellant also testified on his own behalf at the hearing and denied any role in the placement of the phone calls. At the conclusion of proof, the trial court revoked the Appellant's probation and remanded him to the Department of Correction and County Workhouse, finding that:

> Let me say that I find Ms. Leigh Nolen's testimony to be totally without credibility. I don't know that I believe any of it. If I do believe any of it, it's very little.
>
> . . . .
>
> I feel like that he was involved in these phone calls, that he had something to do with this in spite of the evidence I've heard here today.

-3-

. . . .

I am finding that he has violated the terms of his probation by continuing to participate in harassment of this victim, Ms. Anna Williams.

. . . .

. . . I'm finding he was behind these phone calls. And while the evidence is totally circumstantial concerning the mailbox, I believe he did that also.

The Appellant appeals this ruling, arguing that:

There is no substantial evidence to support the trial court's findings. . . . Ms. Nolen confessed to the trial court that she committed a crime by contacting Ms. Williams. Both [the Appellant] and Ms. Nolen testified that [the Appellant] had no idea that Ms. Nolen was going to place the calls to Anna Williams.

## ANALYSIS

If the trial court finds by a preponderance of the evidence that a defendant has violated a condition of his probation, the court has the authority to revoke the probation and reinstate the judgment as originally entered. Tenn. Code Ann. § 40-35-311 (2003). This court reviews a revocation of probation under an abuse of discretion standard. *State v. Stubblefield*, 953 S.W.2d 223, 226 (Tenn. Crim. App. 1997). This means that, if the record presents substantial evidence to support revocation, the trial court's action will be approved. *Id.* In other words, the evidence need only show that the trial judge has exercised "conscientious and intelligent judgment in making the decision rather than acting arbitrarily." *State v. Leach*, 914 S.W.2d 104, 106 (Tenn. Crim. App. 1995) (citing *Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980), *perm. to appeal denied*, (Tenn. 1981)). Thus, in reviewing the trial court's action, it is our obligation to examine the record and determine whether the trial court has exercised a conscientious judgment.

In the present case, the trial court specifically stated that it did not credit Nolen's testimony that she was solely responsible for the phone calls to the victim. In probation revocation hearings, the credibility of witnesses is to be determined by the trial court. *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). The harassing phone calls began immediately after the victim encountered the Appellant in the bowling alley parking lot. Nolen testified that she did not know the victim prior to this incident. Nolen provided an implausible explanation as to why she would place such harsh phone calls to a stranger, *i.e.*, she "was angry at the world" and "wanted to take it out on somebody." Our law provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense. Tenn. Code Ann. § 34-11-402(1) (2003). Moreover, on the morning following these phone calls, the victim's mailbox was completely uprooted, and it appeared to have

-4-

been run over. Accordingly, we conclude that the evidence from the revocation hearing established by a preponderance of the evidence that the Appellant violated the terms of his probation by contacting the victim. The primary goal of non-institutional punishment is to provide a period of grace in order to assist the rehabilitation of a penitent offender. *Burns v. United States*, 287 U.S. 216, 220, 53 S. Ct. 154, 155 (1932). Based on the record before us, we cannot conclude that the trial court abused its discretion in revoking the Appellant's suspended sentences and ordering reinstatement as originally imposed.

## CONCLUSION

Based upon the foregoing, we conclude that the trial court did not abuse its discretion in ordering revocation of the Appellant's sentences. The judgment of the Madison County Circuit Court is affirmed.

 

 

_____

DAVID G. HAYES, JUDGE